An unpublished opinion of the North Carolina Court of Appeals does not constitute controlling legal authority. Citation is disfavored but may be permitted in accordance with the provisions of Rule 30(e)(3) of the North Carolina Rules of Appellate Procedure.

IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA25-119

Filed 19 November 2025

Forsyth County, No. 23JT000131-330

In re: W.D.T-W.

Appeal by Respondent-Mother from order entered 25 October 2024 by Judge Carrie F. Vickery in Forsyth County District Court. Heard in the Court of Appeals 28 October 2025.

> *Spidell Family Law, by Megan E. Spidell, for Respondent-Appellant Mother.*
>
> *Morrow, Porter, Vermitsky and Taylor, PLLC, by John C. Vermitsky and Rebecca Costello, for Petitioners-Appellees.*

COLLINS, Judge.

Mother appeals from an order terminating her parental rights to her child, Walter.[1] Mother argues that the trial court erred by terminating her parental rights because the Randolph County Department of Social Services was a necessary party to the termination proceeding, the trial court erred by denying her motions to dismiss,

---

[1] We use a pseudonym to protect the identity of the minor child. *See* N.C. R. App. P. 42. Father is not involved in this appeal.

and the trial court erred by finding neglect as a ground to terminate her parental rights. Mother also petitions this Court for a writ of certiorari to address juvenile and civil orders entered two and a half years before the termination of her parental rights. For the reasons below, we deny the petition for a writ of certiorari and affirm the termination of parental rights order.

## I.   Background and Procedural History

Walter was born to Mother on 17 April 2021. At the time, Mother was seventeen years old, and Mother and Walter were living with Father at Father's grandparents' home. Both Mother and Father have a history of domestic violence and substance abuse.

On 19 July 2021, when Walter was about three months old, Father perpetrated severe domestic violence against Mother and Walter. Father took seventeen Xanax and was taken to the hospital, where he left against medical advice to return to the home he shared with Mother, Walter, and his grandparents. There, Father assaulted members of the home.

On 22 July 2021, while under the influence of illegal drugs, Father broke into a room wherein various members of the household, including Mother and Walter, had barricaded themselves and violently assaulted them. Walter's thigh was bruised as a result of Father forcefully grabbing him. The violence occurred because Father wanted to take Walter, but the family would not allow him to. Law enforcement responded to the scene, and Father was arrested and charged with breaking and

entering with intent to terrorize and injure, interference with emergency communications, assault on an individual with disabilities, and four counts of assault on a female.

Following Father's arrest, Mother and Walter's paternal grandmother bonded Father out of Randolph County Jail and continued contact with Father, in violation of conditions of Father's bond requiring that he not have any contact with Mother or Walter's paternal grandmother. Mother and Walter initially stayed at her parents' home following the incident; however, they returned to Father's grandparents' home a few days later. Mother subsequently refused to return to her parents' home.

On 26 July 2021, Randolph County Department of Social Services ("DSS") filed a petition alleging that Walter was neglected and dependent. An order for non-secure custody was entered the same day, and Walter was placed in a licensed foster home.

Mother was involuntarily committed to the hospital on 28 July 2021 after threatening to harm herself if Walter was not returned to her. Mother remained hospitalized until 17 August 2021. While in the hospital, Mother reported that she had been smoking marijuana every two days, took Xanax regularly, and used a hallucinogen about two months prior to her hospitalization. She was diagnosed with disruptive mood dysregulation disorder, borderline personality traits, cannabinoid dependency uncomplicated, tobacco use disorder, and sedative hypnotic or anxiolytic dependence in remission. She was prescribed the following medications: Trazadone 50mg, Trileptal 300mg, Abilify 5mg, and Lexapro 10mg.

After being released from the hospital, Mother obtained a 50B domestic violence protective order against Father. As part of the DSS neglect and dependency case, Mother was allowed certain visitation with Walter. She exercised visitation only six or seven times out of a possible twenty-eight visits.

Walter was moved from his licensed foster care placement and placed with his maternal uncle and aunt ("Petitioners") on 4 September 2021.

On 7 November 2021, Mother perpetrated severe domestic violence against Father at Father's residence. Mother and Father were fighting over Xanax Mother had purchased, and Father was destroying Mother's car. When Father walked away from the vehicle, Mother ran Father over with her car. Law enforcement responded to the scene, and Mother reported that she did not remember running Father over. Father refused to press charges against Mother.

Walter was adjudicated neglected and dependent in December 2021.[2] A disposition hearing was held on 5 January 2022. Mother and Father came to court together. Mother left the hearing early and put both middle fingers up to the people in the courtroom on her way out the door.

In the disposition order, the trial court found that it was in Walter's best interest to remain in DSS custody and approved of Walter's placement with Petitioners. The trial court ordered that Mother enter into and comply with a services

---

[2] This adjudication order is not in the record on appeal, but the adjudication is referenced in other orders.

agreement with DSS, which included:

> a. Complete parenting classes and consistently demonstrate safe, appropriate parenting.
>
> b. Comply with all recommendations from her assessment regarding substance abuse treatment until discharged by her treatment provider. If the Mother tests positive for any substance that is not prescribed to her then she shall obtain a new substance abuse assessment and follow all recommendations.
>
> c. Complete random urine and hair drug screens upon request.
>
> d. Obtain and maintain stable, legal, and verifiable income sufficient to meet the child's needs and provide verification of her income to RCDSS.
>
> e. Obtain and maintain stable housing that meets basic standards of safety and cleanliness.
>
> f. Engage in individual mental health therapy until released by therapist and complete a psychiatric assessment for medication management and take any/all medications as prescribed.
>
> g. Successfully complete domestic violence support group and demonstrate skills learned.
>
> h. Successfully complete a domestic violence batterer's intervention program and demonstrate skills learned. If RCDSS is not able to locate a domestic violence batterer's intervention program for women in the next thirty days, then the Mother can complete anger management classes instead.
>
> i. Participate in the child's medical/mental health/other treatment when requested and demonstrate her ability to consistently meet the [child's] medical/mental health needs.

j. Sign release of information forms with all service and medical providers allowing RCDSS to receive information and exchange information with the service providers, the GAL, and the Court.

k. Contact the Social Worker within 48 hours (2 days) of any change to her phone number, mailing address, or the place where she stays. If the Social Worker is not available, the Mother will leave a detailed voicemail or message that includes her correct contact information[.]

By 10 February 2022, Mother was pregnant with another child by Father, had stopped working on her case plan, had not maintained contact with Walter, and had stopped communicating with DSS. With regard to her case plan, Mother failed to maintain a job, failed to complete parenting classes, failed to complete drug screenings, and failed to complete domestic violence batterer's intervention treatment.

At a permanency planning hearing on 13 April 2022, DSS recommended that custody of Walter be granted to Petitioners based on Mother's and Father's lack of progress. The trial court entered an order terminating juvenile court jurisdiction and commencing a civil custody case between Mother and Petitioners. The trial court also entered a civil custody order finding Mother unfit and granting sole legal and physical custody of Walter to Petitioners with certain supervised visitation privileges for Mother. In its findings of fact, the trial court was unable to verify where Mother was living and whether Mother was complying with her mental health and drug abuse treatments because Mother failed to sign the appropriate release of information

forms.

Fifteen months later, in July 2023, Petitioners filed a Petition for Termination of Parental Rights. By that point, Walter was two years old and had lived with Petitioners for over twenty-two months. Petitioners alleged that Mother had failed to attend her first scheduled visit with Walter after the civil custody order was entered, saw Walter at a family gathering in June 2022 that was not a scheduled visit, and then did not see Walter again for about ten months, until on or about 8 April 2023. As Mother had missed more than three months of consecutive visits, Mother had no visitation rights with Walter at the time the TPR petition was filed. Petitioners alleged that Mother neglected Walter by failing to provide proper care and supervision, by allowing him to live in an environment injurious to his welfare, and by abandoning him.

After a hearing on 24 September 2024, the trial court entered a written order on 25 October 2024 finding grounds to terminate Mother's rights to Walter based on neglect and concluding it was in Walter's best interest for Mother's rights to be terminated. At the time, Walter was three and a half years old and had resided with Petitioners for thirty-six months. The trial court found that there was a "good and strong relationship between Petitioners and [Walter]" and that it was in his best interest to "be free for adoption by [] Petitioners[.]"

Mother filed a notice of appeal from the Termination of Parental Rights Order on 14 November 2024.

## II.    Discussion

### A. Petition for writ of certiorari

More than five months after filing her notice of appeal from the Termination of Parental Rights Order ("TPR order"), on 1 May 2025, Mother filed a petition for writ of certiorari, asking this Court to review arguments concerning the permanency planning order and civil custody order entered nearly three years earlier, in April 2022.

The Juvenile Code provides that notice of appeal "shall be given in writing . . . within 30 days after entry and service of the order[.]" N.C. Gen. Stat. § 7B-1001(b) (2024); *see also* N.C. R. App. P. 3.1(b). Timely notice of appeal is a jurisdictional requirement, "and an untimely attempt to appeal must be dismissed." *In re A.L.*, 166 N.C. App. 277, 277 (2004) (quotation marks and citation omitted).

A writ of certiorari is "an extraordinary writ used to aid an appellate court's jurisdiction." *Cryan v. Nat'l Council of YMCAs of the U.S.*, 384 N.C. 569, 570 (2023). "The writ of certiorari may be issued in appropriate circumstances by either appellate court to permit review of the judgments and orders of trial tribunals when the right to prosecute an appeal has been lost by failure to take timely action[.]" N.C. R. App. P. 21(a)(1).

"When contemplating whether to issue a writ of certiorari, our state's appellate courts must consider a two factor test." *Cryan*, 384 N.C. at 570. "That test examines (1) the likelihood that the case has merit or that error was committed below and (2)

whether there are extraordinary circumstances that justify issuing the writ." *Id.* "We require extraordinary circumstances because a writ of certiorari 'is not intended as a substitute for a notice of appeal.'" *Id.* at 573 (citation omitted). "If courts issued writs of certiorari solely on the showing of some error below, it would 'render meaningless the rules governing the time and manner of noticing appeals.'" *Id.* (citation omitted). "[T]he decision to issue a writ of certiorari rests in the sound discretion of the presiding court." *Id.*

Here, the record indicates that Mother was represented by counsel in April 2022 and that no appeal of the April 2022 orders was filed. Although Mother acknowledges her failure to timely notice appeal, she attempts no explanation for the failure. The challenged orders found Mother unfit; granted Petitioners sole legal and physical custody of the child, who had resided with Petitioners for seven months at that point; and allowed Mother monthly visitation. Mother failed to exercise her visitation. The civil custody order also specifically found that Mother could file a motion to modify the order based on an alleged change of circumstances; Mother made no such motion.

The parties operated under the civil custody order for two and a half years until Mother's parental rights were terminated by order entered 25 October 2024. Mother now asks this Court to consider the validity of the April 2022 orders such that DSS had to be joined as a party to the TPR action.

First, it is of note that Walter's foster care social worker from DSS was the first

witness called on Petitioners' behalf. Furthermore, she asks us to review the April 2022 orders despite failing to exercise her visitation with the child. And most finally, Mother's delay in disputing the validity of the April 2022 orders is unreasonable and not excusable.

For these reasons, we exercise our discretion and deny Mother's petition for writ of certiorari.

## B. DSS as a party

Mother argues that DSS was a necessary party to the TPR proceeding. Mother specifically argues that upon the filing of the TPR petition, summons should have been issued to DSS under N.C. Gen. Stat. § 7B-1106, and because summons should have been issued to DSS, DSS was a necessary party under Rule 19 of our Rules of Civil Procedure. We disagree.

In an action for termination of parental rights, upon filing of the petition, the court shall cause a summons to be issued to "any county department of social services to whom placement responsibility for the child has been given by a court of competent jurisdiction." N.C. Gen. Stat. § 7B-1106(a)(4) (2024). Here, the trial court terminated juvenile court jurisdiction and commenced a civil custody case between Mother and Petitioners. The trial court entered a civil custody order finding Mother unfit and granting sole legal and physical custody of Walter to Petitioners. As DSS did not have placement responsibility for Walter, summons need not have been issued to DSS. Because Mother's argument based on N.C. Gen. Stat. § 7B-1106 fails, Mother's

argument that DSS was a necessary party fails. Thus, we need not determine whether the Rules of Civil procedure apply in the manner Mother alleges.

## C. Termination

Mother argues that the trial court erred by denying her motions to dismiss at the close of Petitioners' evidence and at the close of all evidence, and by finding that there was clear, cogent, and convincing evidence of neglect. Mother specifically argues that there is insufficient evidence to support a finding that there was a probability of repetition of neglect and that the trial court failed to consider evidence of changed conditions.

### 1. *Standard of Review*

"Our Juvenile Code provides for a two-step process for termination of parental rights proceedings consisting of an adjudicatory stage and a dispositional stage." *In re B.A.J.*, 295 N.C. App. 593, 599 (2024) (cleaned up). "At the adjudicatory stage, the petitioner bears the burden of proving by clear, cogent, and convincing evidence the existence of one or more grounds for termination under section 7B-1111(a) of the General Statutes." *Id.* "We review a trial court's adjudication of grounds to terminate parental rights to determine whether the findings are supported by clear, cogent, and convincing evidence and the findings support the conclusions of law." *Id.* "Unchallenged findings of fact are deemed supported by competent evidence and are binding on appeal." *Id.* "The trial court's conclusions of law are reviewable de novo on appeal." *Id.*

"If the trial court concludes that there are grounds to terminate parental rights, the court proceeds to the dispositional stage, at which the court must consider whether it is in the best interests of the juvenile to terminate parental rights." *Id.* "We review the trial court's dispositional findings of fact to determine whether they are supported by competent evidence." *Id.* "Unchallenged dispositional findings are binding on appeal." *Id.* "A trial court's best interests determination is reviewed solely for abuse of discretion." *Id.*

### 2. Analysis

Pursuant to N.C. Gen. Stat. § 7B-1111(a)(1), the trial court may terminate a parent's parental rights upon finding that "[t]he parent has . . . neglected the juvenile." N.C. Gen. Stat. § 7B-1111(a)(1) (2024). A neglected juvenile is defined as one whose parent "[d]oes not provide proper care, supervision, or discipline[,]" "[c]reates or allows to be created a living environment that is injurious to the juvenile's welfare[,]" or "[h]as abandoned the juvenile[.]" N.C. Gen. Stat. §§ 7B-101(15)(a), (b), (e) (2024). "Abandonment has been defined as wilful neglect and refusal to perform the natural and legal obligations of parental care and support." *In re Humphrey*, 156 N.C. App. 533, 540 (2003) (citation omitted). "[I]f a parent withholds his presence, his love, his care, the opportunity to display filial affection, and wilfully neglects to lend support and maintenance, such parent relinquishes all parental claims and abandons the child." *Id.*

"Such neglect must exist at the time of the termination hearing." *In re B.A.J.*,

295 N.C. App. at 604 (cleaned up). "If the child has been separated from the parent for a long period of time, there must be a showing of past neglect and a likelihood of future neglect by the parent." *Id.* "This Court has expressly stated that '[a] parent's failure to make progress in completing a case plan is indicative of a likelihood of future neglect.'" *Id.* (*quoting In re C.M.P.*, 254 N.C. App. 647, 655 (2017)). "Additionally, a parent's failure to demonstrate that sustained behavioral change of the type necessary to ensure the minor child's safety and welfare can support a conclusion that there is a likelihood of repetition of neglect." *Id.* (cleaned up).

Here, it is undisputed that Walter was previously adjudicated neglected. As to the likelihood of future neglect, the trial court made numerous unchallenged findings of fact that support its conclusion that there is a likelihood of future neglect by Mother were Walter to be returned to her care, including:

> 31. On June 7, 2022, Respondent Mother scheduled her first visit with Petitioners to see the minor child and failed to show up for it. She never scheduled another official visit with the child[.]
>
> . . . .
>
> 34. On September 11, 2022, [Mother's] second minor child was born. The baby tested positive for marijuana at birth. Despite the 50B being in place, and Respondent Father threatening to remove and kill the child, Respondent Mother allowed him to be present in the hospital immediately after the child's birth and, at no time, sought help or called law enforcement (not even after she was away from Respondent Father). Respondent Mother testified at the hearing that she did not tell the hospital staff that Respondent Father was not supposed to be there

and that a 50B was in place because staff wasn't around her in the hospital. The court did not find this statement even remotely credible.

. . . .

36. After the June 7, 2022 no-show visit described above in ¶31, Respondent Mother never scheduled another court ordered visitation with the minor child, but had some incidental contact with him at family gatherings . . . .

. . . .

38. Respondent Mother testified that she did not schedule her 1 time per month visits because they would have taken 3 hours with travel time.

39. When the second baby was born in September 2022, in-home services were initiated by Randolph County Department of Social Services. . . .

> d. [Mother] attended some ALCON meetings, but did not follow up with a recommendation for NA or AA meetings for her own relapse prevention.
>
> e. On March 21, 2023, . . . Respondent Mother was charged with speeding 106 MPH in a 65 MPH zone and reckless driving to endanger with her [second] infant son in the car. She lied to the social worker and told her it was 75 (or 80) MPH.
>
> f. Respondent Mother rented an apartment November 2023 through May 2024 and did not live in it. Respondent Mother said she rented the apartment as [a] "hideout; to get away from all the stress and stuff[.]"
>
> g. The case closed before the 50B [against Father] expired on June 9, 2023, and Respondent Mother did not renew the 50B as promised to DSS.
>
> > i. On December 11, 2023, she attempted to

> take out another 50B on Respondent father, and when the ex-parte relief was denied, she failed to even attend the 10-day return hearing and the matter was dismissed for failure to prosecute.

40. Respondent Mother has never sought a custody order for the second child with [Father]. She has had to be repeatedly reminded by her parents and DSS social workers that it is not a good idea to allow him in the life of her minor children.

. . . .

42. The minor child's Guardian ad Litem in this case, attorney Porsha Buresh, requested drug screens from Respondent Mother beginning November 7, 2023, when she sent an email with a link to the testing facility. Respondent Mother declined to take the test. She was asked again in February 2024, via email, and declined to take the test. She was asked in March 2024 and declined to take the test. Five months after Ms. Buresh's request, on April 30, 2024, Respondent Mother finally submitted, and her test was negative. During the hearing, when asked why she did not submit to the drug tests requested by Ms. Buresh, Respondent Mother responded "I don't know what was going on, but it was something." The Court does not find Respondent Mother's testimony credible, and is further concerned that Respondent Mother refused to timely submit to the requested drug tests because she was using substances again.

. . . .

45. Respondent Mother and Respondent Father neglected the minor child. He has been adjudicated a neglected juvenile by Randolph County Juvenile Court order as described in ¶21.

> a. Additionally, pursuant to NC Gen. Stat. §7B-101(15)(b), both parents have neglected the child by abandonment over a period of time outside of just

- 15 -

the 6 months prior to the filing of this Petition for Termination of Parental Rights.

b. The Court acknowledges some contact with the child by Respondent Mother, but incidental contacts at group family functions are not the same thing as intentional visitation and show minimal effort to schedule visits or see the minor child. Said minimal effort amounts to willful neglect and refusal to perform the natural and legal obligations of parental care and support.

46. The Court also finds by clear, cogent, and convincing evidence that there is a likelihood of repetition of neglect. The Court considered the history of neglect in this case as well as the changed circumstances in determining there is a substantial likelihood of future neglect of this child if he were in the care of Respondent Mother or Father.

a. The Court acknowledges, as it related to Respondent Mother, that some things have changed, and some changed for the better, but specifically finds that the change is not adequate to protect the child from future neglect.

. . . .

47. The Court finds there is a risk of future exposure to domestic violence, substance abuse and an overall injurious environment in which the minor child would not receive proper care or supervision based on a demonstrated pattern by Respondent Mother of poor judgment and decision making from the child's birth to the present, all of which are inconsistent with the health and safety of the minor child. The Court incorporates all Findings of Fact above and highlights those below:

a. Lack of adherence to the case plan when the minor child was in DSS custody. Respondent Mother provided excuses that this Court finds were not even remotely credible. The Court finds she was even flippant, at times, regarding the seriousness of the

allegations and requirements to remedy them.

b. The act of resuming her relationship with Respondent Father, conceiving a second child and having Respondent Father present at the birth of the second child all while a domestic violence protective order was in place.

c. A further risk of exposure to domestic violence as Respondent Mother refused to complete batterers intervention because of her own determination she was "acting in self defense" when she ran Respondent Father over with a car, and her inability to see her own culpability in exposing the minor child to domestic violence.

d. Respondent Mother's present denial of her own contributions to the acts of domestic violence in this case.

e. The following judgment calls and testimony about them:

> i. Flipping the court off during the dispositional hearing in Randolph County and telling this Court during this proceeding it was because she was "hormonal."
>
> ii. The waste of financial resources to rent [an] apartment from November 2023 to May 2024 and never reside in it[.]
>
> iii. Driving 106 MPH with an infant in her car in March 2023 and then lying to the in-home services social worker that it was 75 or 80 MPH[.]
>
> iv. Refusing to timely take drug tests requested by the Guardian a[]d Litem and telling this Court, "I don't know what was going on, but it was something." The Court draws the reasonable inference that she did

not submit for the tests because she knew they would be positive.

v. Approximately 3 months before this trial, when learning Respondent Father was going to get married, stating to her mother that she was upset because "he thought he could do that with her, but he can't do that with me." The Court finds this evinces that she is open to the idea of resuming a relationship with Respondent Father and downplays the seriousness of his violence and substance abuse.

vi. The deliberate choice to allow the domestic violence protective order to expire once DSS closed the in-home services case.

vii. The deliberate choice not to attend the 10-day return hearing on the December 2023 domestic violence protective order Complaint.

viii. The way the above poor decisions have further opened the door to allow easier access to contact with Respondent Father, and the Court specifically finds that was her intended purpose[.]

ix. Trying to change email contact on minor child's medical records and the way Respondent Mother did not seem to realize that could harm the child by limiting access of the legal custodian to important healthcare information and/or confusing the child's healthcare providers.

x. Telling DSS she was completing and getting something out of her treatment during her case plan for her second son, but telling this court she got nothing out of it.

xi. Lack of contact or attempts to visit this

minor child after the custody order was put in place.

As these findings of fact are unchallenged, they are deemed supported by competent evidence and are binding upon us. *In re B.A.J.*, 295 N.C. App. at 599. These findings of fact show that Mother abandoned Walter, failed to complete all of the components of her case plan, failed to fulfill the natural and legal obligations of parental support, failed to provide proper care and supervision of Walter, and failed to understand the role she played in Walter's neglect. These findings support the trial court's conclusion that there was a likelihood of future neglect by Mother. N.C. Gen. Stat. §§ 7B-101(15)(a), (b), (e); *see In re B.A.J.,* 295 N.C. App. at 607.

Because the trial court's findings support its conclusions of law that there was a likelihood of future neglect if Walter was returned to Mother's care, and the trial court specifically considered changed conditions inadequate to protect Walter from such future neglect, the trial court did not err by denying Mother's motions to dismiss and determining that grounds existed to terminate Mother's parental rights under N.C. Gen. Stat. § 7B-1111(a)(1). *See id.*

### III. Conclusion

The trial court's adjudicatory findings of fact are supported by clear, cogent, and convincing evidence, which in turn support the trial court's conclusion of law that Walter was a neglected juvenile. Accordingly, we affirm the trial court's order terminating Mother and Father's parental rights. Mother's petition for writ of

certiorari is denied.

AFFIRMED.

Judges FLOOD and MURRY concur.

Report per Rule 30(e).